**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| CERTAIN UNDERWRITERS at LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. AH00000154-01, | |
| Plaintiff, | CIVIL ACTION NO.: 4:22-cv-35 |
| v. | |
| CHERYL EDENFIELD, as mother and legal guardian of Quincy Edenfield, an incapacitated adult, SADIE EDWARDS, as mother and legal guardian of Adam Edwards, an incapacitated adult, and CATHERINE MOORE, as next of kin and legal guardian of Jonathan Moore, an incapacitated adult, | |
| Defendants. | |

## O R D E R

Plaintiff Certain Underwriters at Lloyd's, London Subscribing to Policy No. AH00000154-01 ("Underwriters") brought this action for a declaratory judgment that it does not owe coverage for default judgments entered against non-party Healthcare Staffing, Inc. in the State Court of Liberty County.  (Doc. 1.)   Presently before the Court is Defendants Cheryl Edenfield, Sadie Edwards, and Catherine Moore's (collectively, "Defendants") Motion to Dismiss, (doc. 12), and Second Motion to Dismiss or Stay in favor of state proceedings, (doc. 21).  For the reasons stated below, the Court **DENIES as moot** Defendants' initial motion, (doc. 12), and **GRANTS** Defendants' Second Motion, (doc. 21).

# BACKGROUND

## I.      Parties, Relevant Non-Parties, and HCS's Insurance Policy with Underwriters

Underwriters is an insurance company whose sole member is Hiscox Dedicated Corporate Member Limited, a corporation located in the United Kingdom.  (Doc. 1, p. 2.)  Cheryl Edenfield is the mother and legal guardian of Quincy Edenfield, an incapacitated adult.  (Id.)  Sadie Edwards is the mother and legal guardian of Adam Edwards, an incapacitated adult.  (Id.)  Catherine Moore is the next of kin and legal guardian of Jonathan Moore, an incapacitated adult.  (Id.)  Quincy, Adam, and Jonathan (at times, "Defendants' wards") resided at Gateway Behavioral Health Services ("Gateway").  (Id. at pp. 4–5; see docs. 1-2, 1-3, 1-4.)  Healthcare Staffing, Inc. ("HCS") is a staffing agency which had a contract with Gateway to provide employees to Gateway who would provide services to Gateway's patients.  (Id. at p. 4; see doc. 1-1, pp. 4–5.)

According to the Complaint, Underwriters issued a policy of insurance to HCS which included both commercial general liability ("CGL") and professional liability ("PL") coverages, policy number AH00000154-01 (the "Policy").  (Doc. 1, p. 7; see doc. 1-9 (the Policy's "Certificate of Insurance" or "Certificate").)  However, based upon the materials Underwriters attached to the Complaint, the precise identity of the entity responsible for issuing the Policy is not totally clear.[1]  In any event, the Policy had per-claim liability limits of $1,000,000.00 and an

---

[1]  As the Court has recognized in (now-terminated) cases brought by each Defendant, there is a genuine dispute of fact as to whether Underwriters or an entity named "Hiscox, Inc." issued the Policy.  See, e.g., Edenfield v. Hiscox, Inc., No. 4:22-cv-146, 2022 WL 17102348, at *4–5 (S.D. Ga. Nov. 22, 2022).  The Certificate of Insurance states that the Policy is "[e]ffective with **UNDERWRITERS AT LLOYD's, London**."  (Doc. 1-9, p. 1 (emphasis in original).)  Furthermore, the Certificate states,

> In [a]ccordance with the authorization granted to Hiscox[,] Inc[.] under [c]ontract . . . by certain Underwriters at Lloyd's, London . . . and in consideration of the premium specified herein, the said Underwriters do hereby bind themselves . . . to insure as follows in accordance with the terms and conditions contained or endorsed [in the Certificate].

(Id.)  However, the Certificate does not indicate that Underwriters issued the Policy, (see generally doc. 1-9), which is a requisite for status as an "insurer" under Georgia law.  See O.C.G.A. § 33-1-2(5) (defining

aggregate limit of $3,000,000.00 for both its CGL and PL coverages and was effective during the period from July 24, 2015, to July 24, 2016.  (Doc. 1-9, p. 1.)  The Policy's CGL coverage applies to "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies."  (Id. at p. 12.)  However, pursuant to Endorsement E9979.1 to the Policy, entitled, "Abuse or Molestation Exclusion," the Policy's CGL coverage does not apply to "bodily injury" arising out of "the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured," or the negligent employment, supervision, or retention of a person who abuses or molests a person in the care of an insured.  (Id. at p. 38.)

Under the Policy's PL coverage, Underwriters agrees to pay all damages and claim expenses (beyond the deductible and subject to applicable liability limits) that the insured becomes legally obligated to pay as a result of any covered "claim."  (Id. at p. 3.)  To be entitled to coverage, however, the claim must be "first made against the Insured during the Policy Period . . . for any Wrongful Act by the Insured or by anyone for whom the Insured is legally responsible."  (Id.)  Additionally, the "wrongful Act" must have been "committed or allegedly committed on or after the Retroactive Date set forth in . . .  the Declarations."  (Id.)  Finally, the Insured must have "had no knowledge of the actual or alleged Wrongful Act" prior to the Policy's inception date.  (Id.)

## II.    Defendants' Abuse Suits, Defendants' Demand Letters, and the Denial Letters

On September 6, 2017, Cheryl Edenfield filed a tort suit on behalf of Quincy against HCS in the State Court of Liberty County, Georgia.  (Doc. 1, pp. 3–4; see doc. 1-1 (Edenfield's state

---

an "insurer" to include a corporation "engaged as indemnitor, surety, or contractor who *issues* insurance") (emphasis added).  Indeed, the Certificate provides that it is "*[b]y* Hiscox, Inc." (Doc. 1-9, p. 1 (emphasis added).)  Moreover, the Certificate is written on Hiscox letterhead, (see doc. 1-9), and lists Hiscox, Inc.'s address at the bottom of each page of the CGL Coverage Form, (id. at pp. 12–29).

complaint).)  In the lawsuit, Edenfield alleged that Quincy, who had been residing at Gateway since May 2012, had been physically abused by Errol Wilkins, an employee of HCS.  (See doc. 1-1.)  Edenfield brought four counts against HCS: (1) failure to train and supervise Wilkins; (2) negligent retention of Wilkins; (3) negligent breach of contract; and (4) assault and battery.  (Id. at pp. 12–16.)  Edenfield attached to her complaint an "Investigative Report" produced by Mitch Sweeney, Gateway's QUM Coordinator, in response to a complaint by another Gateway instructor who had observed Wilkins hitting Quincy and other individuals.  (Doc. 1-1, pp. 19–29.)  The report concluded that the allegations of abuse inflicted by Wilkins were substantiated.  (Id. at p. 27.)

A week later, Edenfield's counsel sent HCS a demand to settle Defendants' claims against it for $12 million.  (Doc. 1-2.)  Pertinently, the demand letter identified Wilkins as an "HCS Social Service Aide."  (Id. at p. 2.)  Edenfield's counsel sent similar letters to HCS on October 7, 2017, and November 13, 2017, on behalf of Sadie Edwards and Catherine Moore, respectively, contending that their wards had also been physically abused by Wilkins, and seeking payment of $8 million to settle each of their claims.  (Doc. 1, p. 5; see doc. 1-4 (Moore's demand letter).)[2]

In letters dated December 18, 2017, representatives from an entity named "Hiscox" sent letters to HCS advising it that Defendants' claims against it were not covered by the Policy.[3] (Docs. 1-5, 1-6, 1-7.)  The letters (the "Denial Letters") stated that Defendants' allegations were

---

[2]  Underwriters purported to attach Edwards' demand letter to the Complaint.  (See doc. 1-3 (titled "Edward's Demand").)  However, this exhibit is actually just a copy of Moore's demand letter, (doc. 1-4).

[3]  Although the Complaint alleges that Underwriters sent these letters and made the decision to deny coverage for claims arising from Wilkins' misconduct, (doc. 1, pp. 5–6), the letters are written on "Hiscox" letterhead, explicitly state that "Hiscox issued [the Policy] to [HCS]" and repeatedly refer to the Policy and HCS, respectively, as the "Hiscox Policy" and "Hiscox['s] Insured," (doc. 1-5, pp. 1–3 (emphasis added); doc. 1-6, pp. 1–3 (same); doc. 1-7, pp. 1–3 (same)).  The letters also conclude by stating that "Hiscox . . . reserves its rights under all other terms, conditions, exclusions and endorsements in the Hiscox Policy, as well as at law."  (Doc. 1-5, p. 3 (emphasis added); doc. 1-6, p. 2 (same); doc. 1-7, p. 3 (same).)

excluded under the Abuse or Molestation Exclusion.  (See doc. 1-5, p. 2; doc. 1-6, pp. 1–2; doc. 1-7, pp. 2–3.)  Furthermore, the Denial Letters contended that PL coverage was inapplicable because the lawsuits were "claims" that were brought several years after the Policy expired.  (Doc. 1-5, p. 3; doc. 1-6, p. 2; doc. 1-7, p. 3.)

Subsequently, in February 2018, Edwards and Moore also filed tort suits against HCS based upon Wilkins' abuse of Jonathan and Adam, respectively, in the State Court of Liberty County (referred to, collectively with Edenfield's tort suit, as the "Abuse Suits").  (See doc. 1-8, p. 4; see also doc. 14-1, pp. 2–3; doc. 14-2, p. 1.)

### III.   Defendants' Default Judgments, the Notice of Judgment, and the Demand Letter

On December 29, 2021, the state court entered default judgments against HCS in favor of each Defendant, totaling $11 million in general damages resulting from HCS's negligent training and retention of Wilkins.  (Doc. 1-8, pp. 12–14 (Moore's default judgment); id. at pp. 15–18 (Edwards' default judgment); id. at pp. 19–22 (Edenfield's default judgment).)  On January 5, 2022, Defendants' counsel sent a "Notice of Judgment and Demand" (the "Notice") to Hiscox advising it that default judgments had been entered against HCS in favor of each of his clients totaling $11 million and offering to settle the three claims for $9.4 million.  (Doc. 1-8, pp. 1–10.) The Notice contends that Hiscox wrongfully and in "bad faith" denied coverage of Defendants' claims and that Hiscox could no longer assert its coverage defenses because it never notified HCS of its intention to seek declaratory relief.[4]  (Id. at pp. 6–10.)  According to the Amended Complaint, Underwriters, through counsel, responded to the Notice on February 4, 2022, arguing that

---

[4] While the Complaint alleges that Defendants' counsel sent Underwriters the Notice, the Notice, in fact, is addressed to "Hiscox Claims Department and related parties."  (Doc. 1-8, p. 2; id. at pp. 3–4 (indicating that the Notice was sent to the "Hiscox Claims Center" and to the attention of various representatives for the "Hiscox Insurance Company").)  Indeed, notably, the Notice never refers to or mentions Underwriters. (See generally doc. 1-8.)

Defendants' claims were not covered and that it was not required to seek declaratory relief.  (Doc. 14, p. 2; <u>see</u> doc. 14-1.)  Specifically, Underwriters stated that the Abuse or Molestation Exclusion applied because Quincy, Adam, and Jonathan were abused by Wilkins while in the "care, custody or control" of HCS.  (Doc. 14-1, pp. 2–3.)  Furthermore, Underwriters stated that the grant of coverage would not apply to "bodily injury" that commenced before the policy's start date.  (<u>Id.</u> at p. 3.)

## IV.   Post-Judgment Discovery Disputes, the Filing of this Action, and Underwriters' Motion to Vacate

Meanwhile, on January 24, 2022, each Defendant secured an order from the state court judge authorizing post-judgment discovery to be taken from Hiscox.  (Doc. 14, p. 2; <u>see</u> doc. 14-2.)  The order states that "Hiscox declined to provide [HSC] with coverage or counsel" in each of the Abuse Suits because it believed exclusions applied to Defendants' causes of action.  (Doc. 14-2, p. 2.)  The order also states that Hiscox never filed for a declaratory judgment to determine whether it was obligated to provide coverage and that "[n]one of the believed exclusions apply to the claims upon which the judgments are based."  (<u>Id.</u>)

On February 4, 2022, Underwriters filed this action seeking a declaration that it does not owe coverage for the default judgments held by each Defendant.  (Doc. 1.)  On February 9, 2022, Underwriters, appearing as a non-party in the Abuse Suits, moved to vacate the state court's post-judgment discovery order.  (<u>See</u> docs. 14-3 (copy of Underwriters' motion to vacate in Edenfield's Abuse Suit), 14-4 (copy of Underwriters' motion to vacate in Edwards' Abuse Suit), 14-5 (copy of Underwriters' motion to vacate in Moore's abuse suit).)  Underwriters argued that the order extended beyond the legal issues joined in the Abuse suits.  (Doc. 14-3, p. 1; doc. 14-4, p. 1; doc. 14-5, p.1.)  Specifically, Underwriters contended that coverage issues were not joined in the Abuse Suits, and, therefore, it was improper for the state court to make a coverage determination or to

"allow the proceedings to be expanded" to address insurance coverage.  (Doc. 14-3, p. 9; docs. 14-4, p. 9; docs. 14-5, p. 9.)   Underwriters also contended that the state court should allow the Defendants' claims for coverage to be resolved in the present suit.  (Doc. 14-3, pp. 6, 9; docs. 14-4, pp. 6, 9; docs. 14-5, p. 6,9.)   In response, Defendants argued that Underwriters' motion was moot because Defendants had yet to seek any discovery and, to the extent Underwriters sought to challenge its liability for the judgments, it had to do so in a separate action.  (Doc. 14–6, pp. 5–6; doc. 14-7, pp. 5–6; doc. 14-8, pp. 5–6.)  Subsequently, Underwriters notified the state court that it was no longer necessary to vacate the discovery order because all parties apparently agreed, and had (separately) advised the court, that coverage issues should be litigated in a separate forum.  (Doc. 14-9, p. 3; doc. 14-10, p. 3; doc. 14-11, p. 3.)

**V.  Defendants' Motions to Dismiss, Defendants' Insurance Suits Against Underwriters and Hiscox, and Defendants' Second Motion to Dismiss**

On April 18, 2022, Defendants filed their Motion to Dismiss Underwriters' Complaint for failure to state a claim under Rule 12(b)(6).  (Doc. 12.)  Defendants argued that there was no actual dispute or controversy because judgments had been entered in the Abuse Suits against HCS—Underwriters' insured—and there were no pending state actions against either Underwriters or HCS.  (Id. at p. 3.)  According to Defendants, Underwriters failed to provide a defense to HCS under a reservation of rights and also failed to seek a declaratory judgment at that time, and, by filing this action, it was seeking what would amount to an advisory opinion in the event there would be future legal action regarding its coverage decisions.  (Id. at p. 8.)  This, Defendants contend, is prohibited under Georgia and federal law.  (Id.)

Subsequently, on May 26, 2022, each Defendant brought a separate suit in state court against, *inter alia*, Underwriters, Hiscox, Inc., and Hiscox Insurance Company, Inc., for (1) negligently and in bad faith refusing to accept Defendants' respective offers to settle within policy

limits, (2) breaching their duty under the Policy to defend HCS in the Abuse Suits, and (3) engaging in a civil conspiracy to deny insurance coverage for HCS.[5]  (Docs. 21-1, 21-2, 21-3.) Defendants' complaints in these suits (the "Insurance Suits") allege that some or all of the Defendants' claims in the Abuse Suits were covered by the Policy.  (Doc. 21-1, p. 11; doc. 21-2, p. 10; doc. 21-3, p. 11.)   More specifically, the complaints allege that HCS was entitled to indemnity under the Policy's CGL and PL coverages for legal liability arising out of the injuries Quincy, Adam, and Jonathan received during the coverage period, and that the Abuse or Molestation Exclusion does not apply to their claims for several reasons.  (Doc. 21-1, pp. 8–10; doc. 21-2, pp. 7–9; doc. 21-3, pp. 8–10.)   Furthermore, the complaints contend that HCS did not forfeit PL coverage because Hiscox and Underwriters had notice of the claims during the coverage period.  (Doc. 21-1, p. 10; doc. 21-2, p. 9; doc. 21-3, p. 10.)

On June 3, 2022, Defendants filed a Second Motion to Dismiss or Stay this action in favor of their state proceedings against Underwriters and Hiscox in the Insurance Suits.  (Doc. 21.) Whereas their first Motion is based upon Georgia law, Defendants' second Motion argues that the Eleventh Circuit's guideposts set forth in Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005), cut towards abstaining from issuing the declaratory relief Underwriters requests.[6]  (Id. at pp. 5–9.)  Defendants argue that abstention is warranted here because Georgia

---

[5]  Underwriters is referred to in the Defendants' state complaints in the Insurance Suits as "Lloyd's," collectively with another defendant, Lloyd's America, Inc. d/b/a Certain Underwriters at Lloyd's, London. (Doc. 21-1, ¶12; doc. 21-2, ¶12, doc. 21-3, ¶12.)  For simplicity, the Court has substituted "Underwriters" for "Lloyd's" when setting forth the state complaints' pertinent allegations.  Additionally, just as the state complaints do, the Court refers in this Order to Hiscox, Inc. and Hiscox Insurance Company collectively as "Hiscox." (See doc. 21-1, ¶7; doc. 21-2, ¶7, doc. 21-3, ¶ 7.)

[6]  To be clear, Defendants argued in its Reply to Underwriters' Response to their initial Motion that the Court should decline to exercise jurisdiction over this action pursuant to Ameritas.  (See doc. 17, pp. 6–12.) However, as stated in Discussion Section I, infra, the Court will not consider these arguments because they were raised for the first time in a reply brief.

has a strong interest in the Insurance Suits and Underwriters has engaged in procedural fencing to circumvent Georgia law and to prevent a Georgia court from ruling on purely state law issues.  (Id. at pp. 7–9.)

While Defendants' Motions were pending, Underwriters removed the Insurance Suits to this Court, but the Court, upon concluding that Underwriters failed to prove that Hiscox had been fraudulently joined, remanded the cases back to the state court due to the lack of complete diversity amongst the parties.  See Edenfield v. Hiscox, Inc., No. 4:22-cv-146, 2022 WL 17102348, at *7 (S.D. Ga. Nov. 22, 2022); Moore v. Hiscox, Inc., No. 4:22-cv-147, 2022 WL 18776010, at *7 (S.D. Ga. Dec. 2, 2022); Edwards v. Hiscox, Inc., No. 4:22-cv-148, 2022 WL 18715976, at *7 (S.D. Ga. Dec. 2, 2022).

## DISCUSSION

### I.  Order to Show Cause

As a preliminary matter, on February 8, 2023, the Court directed Defendants to show cause as to whether the Second Motion to Dismiss mooted or superseded the initial Motion, since Underwriters amended its Complaint between the two filings.  (Doc. 40, p. 1 n.1.)  As a general rule, an amended complaint supersedes and replaces the original complaint *unless the amendment specifically refers to or adopts the earlier pleading*."  Varnes v. Local 91, Glass Bottle Blowers Ass'n, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982) (emphasis added).  Here, the Amended Complaint explicitly incorporates the Complaint's allegations.  (Doc. 14, p. 1 (Underwriters "incorporate[s] each and every allegation and exhibit in its initial Complaint as if set forth herein . . . .").  Thus, Defendants are correct that the filing of the Amended Complaint did not moot their first Motion.  (Doc. 43, pp. 1, 4.); cf. Wimberly v. Broome, No. 6:15-cv-23, 2016 WL 3264346, at *1 (S.D. Ga. Mar. 29, 2016) (collecting cases dismissing a motion to dismiss a complaint which has been

superseded by the filing of an amended complaint which does not incorporate the earlier pleading's allegations). However, Defendants concede that, "as a matter of judicial efficiency," (id. at p. 2), their second Motion may be deemed to have superseded their first Motion because the second Motion "reflect[s] the more recent developments in the state court actions and the new allegations and exhibits of the Amended Complaint in this action," (id. at p. 4). Indeed, the absence of any ongoing proceeding relating to the coverage issues raised in this suit was integral to the initial Motion. (See doc. 12, p. 8 ("Underwriters is not 'walking in the dark' regarding a pending action requiring immediacy of choice; it is seeking an advisory opinion from this Court *in the event there is future legal action regarding its past, firm determination that it had no duty to defend its insured*.") (emphasis added).) Whereas, in contrast, the second Motion explicitly argues that the Court should abstain from issuing declaratory relief in light of the Insurance Suits filed by each of them a week prior. (See generally doc. 21.)

Notwithstanding their concession that the Court may deem the initial Motion superseded by the Second Motion, Defendants ask that the Court consider and evaluate the "arguments regarding the Ameritas factors in the briefing for the initial motion to dismiss" because they "were not fully reiterated in the briefing for the second motion to dismiss, and instead [were] referenced" therein. (Doc. 43, pp. 4–5.) The Court declines to do so. First, Defendants' "arguments" amount to entirely new grounds for dismissal which were not made in Defendants' initial briefing on the original Motion. The crux of Defendants' first Motion was that the Court lacked jurisdiction because *Georgia* law prohibits Underwriters from obtaining a declaration regarding its denial of coverage. (See doc. 1.) In Response, Underwriters argued that Georgia law and procedure are inapplicable to cases, such as the present one, brought under the Declaratory Judgment Act. (See doc. 15.) In their Reply, Defendants *conceded* that "Georgia law respecting 'justiciability' does

not control" and pivoted to argue, for the first time, that the Court should exercise its discretion not to issue the declaratory relief sought in this case.  (Doc. 17, p. 3; see id. at pp. 6–12.)  Specifically, Defendants contended that the Ameritas guideposts—which neither party had referenced previously—show that abstention is warranted.  (Id. at pp. 6–12.)  Issues raised for the first time in a reply brief are not properly before the Court where they could and should have been presented previously, Evans v. Berryhill, No. 3:15-cv-096, 2017 WL 989274, at *6 (S.D. Ga. Feb. 21, 2017), and it is well-established that the Court need not consider them, Kellner v. NCL (Bahamas), LTD., 753 F. App'x 662 667 (11th Cir. 2018).  Therefore, the Court will limit its analysis to the arguments Defendants raised in the Second Motion.

## II.    The Declaratory Judgment Act and the Court's Discretion to Abstain Under the Brillhart/Ameritas Doctrine

Underwriters seeks relief solely under the Declaratory Judgment Act, which permits federal courts to "declare the rights and other legal relations of any interested party" in a "case of actual controversy within its jurisdiction."  28 U.S.C. § 2201(a).  The Declaratory Judgment Act does not bestow an "absolute right upon the litigant" to obtain declaratory relief; rather, it is an "enabling act" which is "understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  Wilton v. Seven Falls Co., 515 U.S. 277, 286–87 (1995); see also 28 U.S.C. § 2201(a) ("[A]ny court of the United States . . . may declare the rights . . . of any interested party seeking such declaration . . . .") (emphasis added).  Stated differently, the Declaratory Judgment Act "only gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so."  Ameritas, 411 F.3d at 1330 (citing Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494 (1942)).  "Accordingly, given the 'nonobligatory nature of the remedy[,]' a district court may, 'in the sound exercise of its discretion,' decide to 'dismiss an action seeking a declaratory judgment.'"  Cont'l Cas. Co. v.

Wheeler Cnty. Bd. of Educ., No. 3:06-cv-047, 2007 WL 9702383, at *2 (S.D. Ga. Jan. 3, 2007) (quoting Wilton, 515 U.S. at 286).

In Brillhart v. Excess Insurance Company of America, the Supreme Court discouraged federal courts from exercising jurisdiction over declaratory judgment actions when "another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." 316 U.S. at 495. The Court recognized that doing so would be "uneconomical as well as vexatious for a federal court," and further warned against "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation." Id. The Court then provided guidance for courts determining whether to abstain from hearing a declaratory judgment action, suggesting, for instance, that such courts consider "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under applicable substantive law, can better be settled in the proceeding pending in the state court." Id.

In Ameritas Variable Life Insurance Company v. Roach, the Eleventh Circuit supplemented the United States Supreme Court's guidance in Brillhart by providing nine non-exhaustive factors or "guideposts" to assist courts in deciding whether to abstain from issuing declaratory relief.[7] 411 F.3d at 1331. The Eleventh Circuit intended the list to "aid district courts

---

[7] The "guideposts" are:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts; (2) whether the judgment in the federal declaratory action would settle the controversy; (3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue; (4) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing'—that is, to provide an arena for a race for res judicata or to achieve a federal hearing in a case otherwise not removable; (5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; (6) whether there is an alternative remedy that is better or more effective; (7) whether the underlying factual issues are important to an informed resolution of the case; (8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and (9) whether there is a close nexus between the underlying factual and legal issues and state law and/or

in balancing state and federal interests," and it stated that the guideposts incorporate "the same considerations of federalism, efficiency, and comity that traditionally inform a federal court's discretionary decision . . . to abstain from exercising jurisdiction over state-law claims in the face of parallel litigation in the state courts." Id.  No single guidepost is determinative, and courts need not apply each guidepost.  Id.  Rather, courts must determine whether abstention is warranted given the "totality-of-the-circumstances." Nat'l Tr. Ins. Co. v. S. Heating & Cooling Inc., 12 F.4th 1278, 1285 (11th Cir. 2021).  Furthermore, the Eleventh Circuit has emphasized that "the greater the difference between concurrent proceedings, the less likely refusing to exercise jurisdiction will further the principles of wise judicial administration, federalism, comity, and avoidance of duplicative and officious federal proceedings." Id. at 1285.  Accordingly, district courts must "take[] into account the similarity between any concurrent proceedings in its totality-of-the-circumstances analysis under Ameritas." Id.

### III.   Abstention is Appropriate Under the **Ameritas** Factors

Defendants argue that the Ameritas guideposts "weigh heavily in favor of dismissal of this Action in favor of the ongoing state proceedings." (Doc. 21, p. 9; see id. at pp. 5–9.)  Defendants contend that Georgia courts have a greater interest in deciding the coverage issues in this case because they "involve[] an insurance policy issued in Georgia by a Georgia corporation, Hiscox, to a Georgia insured, [HCS]."  Furthermore, Defendants argue that "the [Insurance Suits] are the only option for all the coverage issues to be addressed with all necessary parties present," most notably Hiscox, the entity that sent the Denial Letters to HCS.  (Id. at pp. 7–8.)  Finally, Defendants contend that Underwriters engaged in procedural fencing by filing this action *after* making the

---

public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

Ameritas, 411 F.3d at 1331.

decision not to defend or indemnify HCS in the Abuse Suits, when it was too late to seek such declaratory relief in state court.

For some of these reasons, as well as others set forth below, the Court finds that wise judicial administration and considerations of federalism compel the Court to exercise its discretion to abstain from adjudicating Underwriters' claims for declaratory relief.

### A.   The Similarities Between this Case and the Insurance Suits Cut in Favor of Abstention.

As noted above, the similarity between the concurrent proceedings is a "significant" consideration which is "encompassed by the relevant Ameritas guideposts, and[,] [therefore,] . . . is granted weight in the balancing of those guideposts." S. Heating & Cooling Inc., 12 F.4th at 1286; see also 17A Charles Alan Wright et al., Federal Practice and Procedure § 4247 n.5 (4th ed. 2021) ("[T]he substantial similarity of the issues in the state and federal proceedings is . . . one factor in the Brillhart analysis."). "[T]o appropriately assess the degree of similarity between concurrent state and federal proceedings, a district court needs to look at the cases as a whole." James River Ins. Co. v. Rich Bon Corp., 34 F.4th 1054, 1061 (11th Cir. 2022) (internal quotations omitted).

There are significant similarities between the issues raised in this case and the Insurance Suits, suggesting that abstention is warranted here. Both this action and the state cases arise from the denial of coverage for Defendants' claims against HCS stemming from Wilkins' alleged abuse of Quincy, Adam, and Jonathan. Integral to all of the cases is whether the victims' injuries are covered by the Policy and, ultimately, whether Underwriters is liable for the default judgments held by Defendants against HCS. Specifically, here, Underwriters asks the Court to declare that it is not responsible for covering these judgments. (Doc. 1, pp. 10–11.) According to Underwriters, the Abuse or Molestation Exclusion applies because Quincy, Adam, and Jonathan were within the

"care, custody or control" of HCS and Wilkins, and PL coverage is unavailable because Defendants' claims were not "first made" during the policy period.  (Id. at pp. 9–10.)  In the Insurance Suits against Underwriters, Defendants claim the exact opposite; they allege that HCS is entitled to indemnity for the default judgments because coverage and a defense were erroneously denied to HCS.  (Doc. 21-1, pp. 8–10; doc. 21-2, pp. 7–9; doc. 21-3, pp. 8–10.)  According to Defendants' complaints in the Insurance Suits, HCS was entitled to CGL and PL coverages for legal liability arising out of Quincy, Adam, and Jonathan's injuries.  (Doc. 21-1, pp. 8–10; doc. 21-2, pp. 7–9; doc. 21-3, pp. 8–10.)  In contrast to Underwriters, Defendants reason that (1) the Abuse or Molestation Exclusion does *not* apply because Defendants' wards never were "in the care, custody or control" of HCS, and (2) Underwriters had notice of their potential claims during the coverage period.  (Doc. 21-1, pp. 9–10; doc. 21-2, pp. 8–9; doc. 21-3, pp. 8–10.)

The same underlying facts and Policy provisions are relevant in deciding the parties' overlapping claims.  For example, both this Court and the state court will have to interpret the Certificate of Insurance to determine whether the Policy's CGL and PL coverages apply to Defendants' claims against HCS.  Furthermore, this case, like the Insurance Suits, would likely involve determinations about the roles that the various entities played (or perhaps did not play) in issuing the Policy and making decisions about coverage and the duty to defend.  See note 1, supra (finding that "[t]here is a genuine dispute of fact as to whether Underwriters or an entity named 'Hiscox, Inc.' issued the Policy").)  The identity (or identities) of the insurer(s) and decision maker(s) is relevant to this case because Underwriters has alleged that it issued the Policy and seeks a declaration that it, as the insurer, does not owe coverage for the default judgments held by each Defendant based upon the Policy's terms and exclusions.  (Doc. 1, pp. 10–11.)  If, as some of the evidence shows, *Hiscox*—not Underwriters—is the insurer and denied coverage, then

Underwriters would not be entitled to such a declaration.  See notes 1 & 3, supra (listing the evidence implicating Hiscox as the insurer).  On the other hand, Defendants' claims in the Insurance Suits are premised upon *Hiscox's* status as the insurer.  (See docs. 21-1, pp. 13–18; doc. 21-2, pp. 13–18; doc. 21-3, pp. 14–19.)  The state court cannot find that Hiscox negligently failed to settle Defendants' claims against HCS without first confirming that HCS, in fact, was Hiscox's insured.  See Edwards, 2022 WL 18715976, at *4 ("Under Georgia law, an insurer must 'use ordinary care and good faith in the handling of a claim against *its insured*.'") (emphasis added) (citing Dumas v. ACCC Ins. Co., 349 F. App'x 489, 491 (11th Cir. 2009)).

Given the overlapping facts, legal issues, and mutual parties, the Court finds that this case and the Insurance Suits are "parallel proceedings."  Scottsdale Ins. Co. v. Detco Indus., Inc., 426 F.3d 994, 997 (8th Cir. 2005) ("Suits are parallel if substantially the same parties litigate substantially the same issues in different forums.") (citation omitted).  Although a parallel proceeding is not a *prerequisite* to a district court's refusal to entertain an action under the Declaratory Judgment Act, it is a "consideration of significant weight."  S. Heating & Cooling Inc., 12 F.4th at 1285; see id. at 1284; see also Med. Assur. Co. v. Hellman, 610 F.3d 371, 379 (7th Cir. 2010) ("One factor supporting a decision to stay an action is the existence of adequate parallel proceedings.").

Notably, Underwriters does not dispute that the federal and state cases are parallel or substantially related.  (See generally doc. 26.)  To the contrary, Underwriters explicitly argued in a separate motion[8] that all of the cases concern "the same underlying liability claim" and "coverage under the same policy."  (Doc. 29, pp. 5,7.)  Underwriters also conceded that addressing the cases

---

[8]  Underwriters raised these arguments in its motion to consolidate this action with the Insurance Suits, (doc. 29), which was filed after Underwriters removed the Insurance Suits to this Court.  The Court denied the motion as moot after the Court remanded the Insurance Suits to the State Court of Liberty County. (Doc. 36.)

separately would lead to "duplicative discovery, rulings, and briefing" given their "commonality of law and fact."  (Id. at p. 7.)  Indeed, the commonalities between this case and the ongoing Insurance Suits distinguish the present suit from others where the Court has declined to abstain from issuing declaratory relief sought by an insurance company.

For example, in Auto-Owners Insurance Co. v. Tabby Place Homeowners Association, Inc., the plaintiff-insurer asked the Court to declare that it had no duty to defend its insured in certain state tort suits filed against its insured.  No. 4:21-cv-346, 2022 WL 4542114, at *2 (S.D. Ga. Sept. 28, 2022).  Like Defendants here, the defendant-insured argued that the Court should abstain from hearing the case based upon the Ameritas/Brillhart doctrine. Id.  The Court disagreed, finding that it would be unproblematic to issue the sought-after declaratory relief given the dissimilarity between the federal and state actions.  Id. at 5–6.  Specifically, the Court reasoned that "there [was] no indication in the record that coverage issues [had] been joined in the [underlying state suit]," and thus it would be "highly unlikely" that the fact finder in the state suit would decide whether the insurance policy covered the claims at issue.  Id. at 5 (internal quotations omitted).

Similarly, in Cincinnati Insurance Co. v. Thunderbolt Harbour Phase II Condominium Ass'n, Inc., the Court held that the existence of a state tort suit did not weigh against considering the insurer's declaratory judgment suit because "the two actions d[id] not present the same issues." No. 4:14-cv-222, 2015 WL 4075148, at *2 (S.D. Ga. July 1, 2015).  Other courts in the Eleventh Circuit have similarly rejected motions to dismiss an insurer's claims for declaratory relief in favor of an underlying state suit where the state action did not involve insurance coverage.  See, e.g., S.-Owners Ins. Co v. Galati Yacht Sales, LLC, No. 8:21-cv-2567-VMC-SPF, 2022 WL 1453480, at *4 (M.D. Fla. May 9, 2022) (finding that a federal declaratory judgment suit was "not sufficiently

similar to the [state suit] to merit dismissal or a stay" because the federal case "turn[ed] on the interpretation of an insurance contract" whereas  the state case involved a "classic tort claim," and therefore "the essential dispute in each [was] different"); N. Assur. Co. of Am. v. Custom Docks by Seamaster, Inc., No. 8:10-CV-1869-T-27MAP, 2011 WL 117046, at *2 (M.D. Fla. Jan. 13, 2011) (declining to dismiss declaratory judgment action under Ameritas because defendants failed to adequately demonstrate that the underlying state proceeding would determine whether the plaintiff-insurer was required to defend or indemnify its insured, the insurance coverage issue was not before the state court, and the insurer was not a party to the state action); Pa. Nat. Mut. Cas. Ins. Co. v. King, No. 11-0577-WS-C, 2012 WL 280656, at *3 (S.D. Ala. Jan. 30, 2012) (denying defendant-insured's request to abstain from declaring whether the plaintiff-insurer owed a duty to defend it in a state suit, in part, because "no insurance coverage claims or defenses ha[d] been joined in the [state] case," and, thus the insurer "ha[d] no platform, other than th[e] declaratory judgment action, available to it to litigate its duty to defend").  The differences between this case and the forgoing authority tilt the scale considerably towards abstaining from the matter at hand.

**B.    The Insurance Suits Offer a Preferable Forum to Resolve Factual Issues Which Are Critical to the Resolution of this Case.**

The sixth, seventh and eighth Ameritas factors, ask, respectively, "whether there is an alternative remedy that is better or more effective," "whether the underlying factual issues are important to an informed resolution of the case," and "whether the state trial court is in a better position to evaluate those factual issues than is the federal court."  Ameritas, 411 F.3d at 1331. All of these factors weigh in favor of abstention.  As stated in the previous subsection, there are factual issues common to this case and the Insurance Suits, most notably the identities of the insurer of the Policy and the entity that made the adverse coverage decisions.  See Discussion Section II.B, supra. The relevant documents Underwriters attached to the Complaint are

inconclusive, suggesting that both Underwriters and Hiscox were involved with issuing the Policy, but that (contrary to Underwriters' allegations in this case) Hiscox issued the Denial Letters and rejected Defendants' demands for settlement. See Background Sections I & II, supra. Therefore, the determination of the identity of the relevant decision maker—a determination which will be necessary within the state court action—is important to the resolution of the present action. Cf. Auto-Owners Ins. Co., 2022 WL 4542114, at *7 (declining to abstain from issuing declaratory relief, in part, because the defendant "failed to identify any facts at issue in the underlying action which [were] important for deciding" whether the insurer's coverage decisions were correct). Furthermore, the state court is in a better position than this Court to make such a finding because, while Hiscox is not a party in this action, it is a defendant in the Insurance Suits, where it is likely to present evidence that will aid in resolving this issue. Similarly, because Hiscox and Underwriters are co-defendants in the Insurance Suits, the state court is a better, more effective forum for resolving the coverage issues common to both cases.

Accordingly, the Court finds that the sixth, seventh, and eighth Ameritas factors cut towards abstention.

> **C.** **The Potential for This Action to Settle the Controversy and Clarify the Legal Relations at Issue Is Significantly Outweighed by the Risk of Friction with the State Court of Liberty County.**

The second and third factors ask, respectively, "whether the judgment in the federal declaratory action would settle the controversy" and "whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue." Ameritas, 411 F.3d at 1331. The fifth guidepost is "whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction." Id.

On the one hand, issuing the declaratory relief Underwriters seeks would settle the issue of whether it is liable for the default judgments against HCS.  Furthermore, deciding Underwriters' claims would help to clarify the legal relationships at issue because the Court could not find that Underwriters properly denied coverage to HCS under the Policy without first confirming that Underwriters—and not Hiscox—made that decision.  Yet, as previously stated, the state court is in a much better position to make such a finding because, unlike in this case, Hiscox is a party in the Insurance Suits.  <u>See</u> Discussion Section II.B, <u>supra</u>.  Furthermore, there is a risk of inconsistent rulings should this case be allowed to proceed, given the overlapping factual and legal issues pertinent to Underwriters' claims in this case and Defendants' claims in the Insurance Suits.  For instance, a conflict would arise if the Court found that Underwriters issued the Policy and properly denied coverage to HCS, while the state court concluded that Hiscox issued the Policy and erroneously denied coverage.  Thus, this case creates the potential for friction inherent in situations where there is "double-tracked, near-identical litigation pending in both federal and state courts, such that the first court's ruling on a particular issue may have *res judicata* effect on the second court's ability to hear and decide the same issue, even if the second court disagrees with the first court's determinations."  <u>Lexington Ins. Co v. Rolison</u>, 434 F. Supp. 2d 1228, 1241 (S.D. Ala. 2006).  Indeed, if the Court were to rule on Underwriters' claims before the state court adjudicated Defendants' state claims, the state court may face "the unenviable catch [twenty-two] of acceding to [a] ruling with which it disagrees or, alternatively, diverging from [the Court's] ruling and reaching an inconsistent result."  <u>Westchester Surplus Lines Ins. Co. v. Romar House</u>, No. 08–0455–WS–M, 2008 WL 5412937, at *5 (S.D. Ala. Dec. 29, 2008).  This sort of encroachment on state proceedings is what <u>Brillhart/Ameritas</u> abstention helps to avoid.

Accordingly, while the second and third factors weigh slightly toward adjudicating Underwriters' claims, the potential for friction between this Court and the state court overwhelmingly suggests that abstention is appropriate here. Cf. Auto-Owners Ins. Co., 2022 WL 4542114 at *8 ("[T]here is no risk of inconsistent rulings on this issue because it is not before the state court; the State Complaint does not refer to the Policies or their Exclusions and there is no indication that a factfinder would be tasked with deciding whether the Property Owners' claims fall within the Policies' terms.").

### D.     Defendants Have Not Shown That Underwriters Has Engaged in Procedural Fencing.

The fourth Ameritas factor considers "whether the declaratory remedy is being used merely for the purpose of 'procedural fencing'—that is, to provide an arena for a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable." 411 F.3d at 1331. Defendants contend that Underwriters engaged in procedural fencing because it filed this case *after* making the decision not to defend or indemnify HCS in the Abuse Suits, when it was too late to seek such declaratory relief in state court. (Doc. 21, pp. 7–8.) Assuming (without deciding) that Defendants are correct that Underwriters waited too long to seek declaratory relief in state court, that does not mean that Underwriters engaged in procedural fencing. "[A]n invocation of the federal Declaratory Judgment Act . . . is neither precluded nor controlled by Georgia's procedural law," Cincinnati Ins. Co. v. Holbrook, 867 F.2d 1330, 1332 (11th Cir. 1989), and "the doors to the federal courts remain open to [insurers] where diversity jurisdiction exists," Payne v. State Farm Fire & Cas. Co., No. 1:11-CV-00309-AT, 2011 WL 13220695, at *3 (N.D. Ga. Aug. 2, 2011). See Holbrook, 867 F.2d at 1333 ("The mere fact, if it be a fact, that the doors of *Georgia's courts* are closed to Cincinnati . . . does not mean that the doors of the *federal courts* are automatically closed to Cincinnati where the requisites for diversity jurisdiction exist.") (emphasis added).

Furthermore, Underwriters filed this action *before* Defendants filed the Insurance Suits, and nothing in the record indicates that Underwriters was aware that Defendants planned to bring the state suits when it filed this suit.  Thus, the Court cannot find that Underwriters was racing to obtain a judgment that would have preclusive effect on the Insurance Suits.

Next, Defendants appear to argue that Underwriters sought declaratory relief in this Court rather than state court to preclude Defendants from bringing certain "compulsory counterclaims" against it.  (Doc. 21, p. 8.) Defendants reason that Hiscox would be "indispensable to the determination of those claims," yet they could not assert them because Hiscox is "a non-diverse entity not subject to jurisdiction."  (Id.)  This argument fails.  "Courts automatically have supplemental jurisdiction over compulsory counterclaims."  James D. Hinson Elec. Contracting Co. v. Bellsouth Telecomms., Inc., No. 3:07-cv-598-J-32MCR, 2011 WL 2448911, at *1 (M.D. Fla. Mar. 28, 2011).  Therefore, assuming (without deciding) that Defendants are correct that their counterclaims would be compulsory, the Court would have supplemental jurisdiction over said claims.  Savannah Forestry Equip., Inc. v. Savannah Equip., Inc., No. 4:92-cv-088, 1992 WL 249882, at *2 (S.D. Ga. Sept. 15, 1992) ("The Plaintiffs urge the Court to dismiss one count of the Defendants' counterclaim for lack of subject matter jurisdiction. . . .  Because the counterclaim is compulsory, the Court has ancillary or supplemental jurisdiction over it.  Accordingly, the Court denies the Plaintiffs' motion to dismiss.").

Based upon the forgoing, because Defendants have not shown that Underwriters has engaged in procedural fencing, the Court finds that the fourth Ameritas factor is neutral.

**E.    Georgia's Interest in the Issues Raised in This Case and the Nexus Between the Underlying Facts and State Law Favor Abstention.**

The first Ameritas factor considers "the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts."  Ameritas, 411 F.3d at 1331.

The ninth factor asks "whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action."  Id.  Both factors weigh in favor of abstention in this case.   Georgia has an interest in deciding the issues raised here because the Policy Underwriters claims to have correctly interpreted was held by HCS, a Georgia corporation.   (Doc. 1, pp. 4, 7; see doc. 1-9.)  Furthermore, Underwriters has alleged that it has no duty to cover the default judgments issued by the courts of this state for injuries suffered by Defendants' wards— all of whom are Georgia residents—while they were residing at Gateway, a Georgia facility.  (Doc. 1, pp. 1, 2, 4, 11; see doc. 1-8, pp. 12–22.)  Additionally, although there is some evidence to the contrary, the Denial Letters indicate that Hiscox, a Georgia corporation, issued the Policy and that its representatives denied coverage to HCS.  See note 3, supra (citing doc. 1-5, pp. 1–3; doc. 1-6, pp. 1–3; doc. 1-7, pp. 1–3)); see S. Heating & Cooling Inc., 12 F.4th at 1288 (district court did not err in concluding that Alabama had a compelling interest in deciding issues raised in declaratory judgment action because "Southern Heating is an Alabama company, the underlying insurance policy was issued in Alabama, and the decedents were Alabama residents").  Furthermore, none of the parties dispute that Georgia law applies to the interpretation of the Policy, and "courts have found a state's interest to be considerable where its law governs the interpretation of the contract at issue."  Auto-Owners Ins. Co., 2022 WL 4542114, at *8 (internal quotations omitted) (collecting cases); see Mid-Continent Cas. Co. v. Northstar Homebuilders, Inc., 297 F. Supp. 3d 1329, 1336 (S.D. Fla. 2018) ("Given Florida law, not federal, governs the substantive issues raised, Florida has a strong interest in this case and federal jurisdiction over this action would only encroach the province of the state court.").  Finally, although federal courts routinely make declarations with respect to insurers' liabilities, Brockwell v. Metro. Life Ins. Co., 409 F. Supp. 3d 1360, 1364 (S.D.

Ga. 2019); <u>S. Heating & Cooling Inc.</u>, 12 F.4th at 1290 (Brasher, J., concurring), Georgia's interest is enhanced here because the coverage decisions involved in this case are *also* at issue in the Insurance Suits.  <u>Cf.</u> <u>Auto-Owners Ins. Co.</u>, 2022 WL 4542114, at *8 (concluding that Georgia's interest in interpreting the insurance policy was especially minimal because the policy was "only at issue in th[e] federal suit"); <u>Phila. Indem. Ins. Co. v. AGCO Corp.</u>, No. 1:10-CV-4148-TWT, 2011 WL 2652139, at *3 (N.D. Ga. July 6, 2011) ("Georgia does not have a particularly strong interest in deciding the coverage issues properly and *exclusively before a federal court.*") (emphasis added).

Accordingly, the Court finds that the state's strong interest and close nexus between state law and the declaratory relief sought in this case tip the scale towards abstention.

## CONCLUSION

In light of the forgoing, because the balance of the <u>Ameritas</u> factors and the totality of the circumstances weigh in favor of abstaining from adjudicating Underwriters' claims for declaratory relief, the Court **GRANTS** Defendants' Second Motion to Dismiss or Stay this case in favor of the ongoing Insurance Suits.  (Doc. 21.)  Defendants' initial Motion to Dismiss, however, is **DENIED as moot**.  (Doc. 12.)  Accordingly, the case is **DISMISSED WITHOUT PREJUDICE** and the Court **DIRECTS** the Clerk of Court to **CLOSE** the case."

**SO ORDERED**, this 23rd day of March, 2023.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA